Good afternoon, may it please the court. I'm Daniel Kaplan. I represent the appellant Dennis Ray Hughes. Yes, just make sure you speak into the microphone. It's easier for us to hear. Thank you. Yes, sir. Daniel Kaplan for the appellant Dennis Ray Hughes. I'd like to reserve three minutes of my time for rebuttal. It was early July in 2005 when Dennis Ray Hughes was driving down a remote rural two-lane road in rural Kansas, and he was swerving across the lanes a few times. A trooper noticed him, was concerned that he might be drunk or sleepy, pulled him over, turning the lights on, and asked for his records, asked him a couple of questions, noticed the cooler was sitting on the passenger side of the seat in front of the car. Was that an improper stop? No. Was it crossing off? We are not challenging the initial stop. He asked for his records. It was a rented car. He got his license. He went back. He checked things out. Everything was fine. He went back, decided not to issue any citation, returned the records, and said, you're free to go and have a good day or something like that. At that point, it was... Get some sleep. Get some sleep, pull over, give him some suggestions, et cetera. At that point, it was simply an ordinary traffic stop like might happen to any of us on any given day. But this was not an ordinary traffic stop counter as it turned out. Officer Barrett took four steps away from the window of the driver's side of the car, not clearing the back of Mr. Hughes' car, turned on his heel, came right back to the window, and engaged in what we considered to be a second improper seizure following that initial traffic stop. By the time he got back to the window, Mr. Hughes hadn't even managed to put his paperwork away. If the stop wasn't improper, what was improper about him coming back? The fact that there was no reasonable suspicion or legitimate grounds to further seize Mr. Hughes. Now, I want to stress that there's two different issues here. We believe that the largest, the most significant error and issue in this case is the search of the car that happened, of course, at the end of this process of this encounter along this rural road in Kansas. And there's two reasons that that was done on the premise that there was consent. Let's look at what happened. Officer Barrett came back to the window, started pressing him about what was in the cooler sitting on the passenger seat, the cooler he had already seen when he did the initial stop, and asking if he could look in the cooler. Mr. Hughes tried to mollify Officer Barrett by pulling a couple of books out of the cooler and showing them and saying there's books in there. And unfortunately for Hughes, one was about bombs and the other one was about poisonous plants. Very true. But it was the testimony by the government's witnesses was that it's legal to have these books and anyone can get them. Could he have done all that if he had done it initially right after the initial stop? I think it would have been legitimate for the officer to ask about the cooler, which he saw when he did the initial stop, because he was concerned about possible drunkenness. He sees a cooler. He said, I was concerned there was something in the cooler. The problem is he didn't. He concluded that there was no appearance of drunkenness, there was no smell of alcohol, and that he was satisfied. He didn't even issue a citation. He went back. He said, you're free to go. And he terminated that initial encounter. Now, of course, an officer can't just keep recycling the same. Let's say that's reasonable suspicion. Let's just assume that for a minute. An officer can't recycle the same reasonable suspicion to keep initiating further seizures ad infinitum. If they decide that they're satisfied with what they've seen, that's the end of the line, and the person is free to go is free to go. So in order for you to win on this piece of your argument, I think you've got to show that turning around, saying you're free to go, turning around, taking a few steps toward the back of the car. Barrett says it was four steps. The other officer, what's his name? Dawson said two or three. He says two or three, but a few steps to the back. Then he turns around and reinitiates. In order to win, you've got to show that under the circumstances he's still not free to go, he feels that he's in custody. Absolutely not. That's the argument. Absolutely not. Correct. I agree. You seem to be saying that once he walked away, Barrett can't revisit the factors that caused him to stop and potentially inquire about the cooler in the first instance. You're suggesting you can't recycle these things. And yet, if that's your argument, I've got some problems with it. So I want to see if that, in fact, is your argument. That's part of the argument. I don't think that's not crucial to the point we're making. And I want to stress, and I can address that. But I want to stress that I have said that the further stop, the second seizure, in effect, was not proper. Even if it was proper, even if the second seizure or the prolonged seizure was proper, there's an independently fatal ground to the search of the car, because it has to also be that the consent that supposedly validated the search was voluntary under the circumstances. See, that's what I understood your argument to be and what I focused on up to today, this element about reasonable suspicion maybe when he walked back to the car a second time I had not focused on. Let me just flag the point about that. The search is invalid if the consent was involuntary, never mind whether the second seizure was valid. The search is also invalid if the consent was voluntary, but the second seizure was invalid and the consent is integrally a part of that invalid second seizure so that it can't be extricated. That's two separate lines in this court's case law and in the other case law we cited. Either of those two things would kill the search. But let me, okay. What I'm after, and we've kind of got the narrative, what I'm after and we kept looking for is a case in which there has been a break like that, pretty short break, but a break like that, officer comes back and it results in suppression. I couldn't find one. I find cases where, you know, the question is extended, you know, there are some cases in this line, but I haven't found none where the guy actually says, you are free to go, turns around, walks away, two or three steps, four steps, comes back, and we've suppressed. I've not found one that gets you there. Do you have a case? Yes, three of them, Your Honor. We cited them in the reply brief. These are three cases from state courts of last resort. The first one is Commonwealth v. Freeman from Pennsylvania. The year is 2000. Very factually similar scenario. I believe in Freeman there was two cars that seemed to be playing cat and mouse. The officer pulled them over. He didn't believe the story they were telling. They seemed to be lying about whether they were playing with the other car. Let me just grab my notes. But as I recall, in Freeman, the officer said to the driver, you're free to leave. After saying that, he actually not only left the window of the car, he went all the way back to his parked patrol car. Then he got out of his parked patrol car, the driver hadn't taken off yet, and returned to that car, and he reinitiated the contact, and he started asking further questions. He said, your story doesn't hold up. He asked the driver to get out of the car, which happened in this case of Mr. Hughes. He asked for consent to search the car, and he got it. And that's a case in which the high court of Pennsylvania concluded that even though that initial stop was valid, as in our case, the consent was invalid because it was essentially an integral part of the improper second stop or prolongation of the stop. The second case we cited like this is Reitinger from the high court of Virginia, the year 2000. A van was pulled over for having only one working headlight. Two deputies stood on either side of the van. The driver said, well, here's a headlight, I'm going to install it tomorrow. They seemed satisfied about that, and the quotation was, you're free to go. That's what the officer said to the driver. But then immediately thereafter, he starts asking some questions. He said, you're free to go, and then he starts asking, do you have any drugs or weapons in the van, which is what Officer Barrett asked Mr. Hughes here. Then he asked for permission to search the van, which he gets. Or actually, he doesn't get an answer right away. He has the driver get out, and he does a pat down, and he finds a marijuana pipe in the person's pocket. That was suppressed. That was also considered to be invalid. Why is there no consent in the second case? The person did not answer the question about giving consent. If you don't answer, you don't give it. Yes, the driver was consulting, and at that point the officer said get out of the car. In our case, Officer Barrett had some conversation with Hughes. He asked him, may I search your car, and Hughes didn't answer right away. He seemed to be shuffling things in the back of the car, and that was when Officer Barrett told him to get out of the car. And then he stood, he said, Officer Barrett said, face to face. We stood face to face, and it was a few seconds. Just a few seconds after that, he presses him again to let him search the car, and Hughes puts up his hands and says go ahead. And the theory that's supposed to validate the search is that under those circumstances, on a pitch dark, unlit, remote rural two-lane road in Kansas with no one around, with a uniformed officer with a Glock sidearm at his hip, having pressed him through all these questions about suspicion about what's in the car, never telling him you have the right to refuse consent to the search of the car, with no real time lapse from the initial stop where he pulled him over with the UConn GMC sitting in the back, bright lights flashing the entire time. A second deputy has pulled up. He's standing there in uniform with his Glock at his sidearm, with his lights flashing the entire time. Under all these circumstances, the theory is that that consent was given freely and voluntarily and not as a matter of acquiescence to a show of authority. The third case I wanted to cite, which is similar factually here as the Garcia case. What if you give consent to a show of authority? If the consent, well, a show of authority can be made and consent can be given, and a court may properly conclude that the consent is freely and voluntarily given, but to do that, it has to consider, it has to decide that under the circumstances in which that consent was given, it wasn't just given as acquiescence to the show of authority. It was given truly, freely, and voluntarily. And this court, looking at similar circumstances, the third case I was going to mention, State v. Garcia, the car was pulled over for swerving. The officer looked at the papers, decided things were okay, and said, the stop's complete. That was the quote, the stop's complete. Then seemed to be walking back to her car, re-initiated contact, got asked about weapons in the car, asked for permission to search the car. That person signed a consent form and, well, this wasn't the case. Yeah, the person signed a consent form and the car was searched and the drugs were found. Even though that officer had said the stop's complete, essentially you can go just as in the other two cases, that was still held to be not a voluntary consent and did not validate the search and what was seized in that case. We think the facts are at least as strong here. Okay. There's one oddity about this case, and that is Mr. Hughes thought, and so far as it goes, was correct, that he had nothing in his car that was illegal. Usually somebody is reluctant to acquiesce or to volunteer or to consent to a search because they got something they think they know as they found it. Hey, they're headed for jail. Now, how do we put that into the equation when Hughes thinks, and turns out he's right, when the officers, after the officers search him, they're going to say, well, this is all very interesting, but we got nothing on you. You're free to go. Does that change the voluntariness equation when he has, in his own mind perhaps, not very strong reasons to object? No, and, Your Honor, it's an important point. It's an important point in light of the nature of the government's attempt to validate, to defend the search. What the government asks you to do, which is what you're asking about as well, is to look into Mr. Hughes' mind and into his subjective understanding.  I believe under the case law, and this was recently confirmed in the Supreme Court case of Brindlin v. California, which we cited in a supplemental citation, that the test is objective reasonableness. The test is, under the circumstances, would a reasonable person believe that he or she was truly free to go, that he or she could terminate the encounter with law enforcement and just take off? I believe it is not appropriate to look at this. Free to go isn't the only factor we look at. Somebody can have been stopped, not free to go, still give voluntary consent. That's correct. You look at all the circumstances in which the purported consent was given. However, that would be a strong factor. Whether the person is in custody is identified as a factor. But the point is, in Brindlin v. California --- I thought it was consent once, and now it's just consenting again. Well, Your Honor, it's another good point, because another supplemental citation we filed was this court's recent decision in U.S. v. Washington. And in that case, consent, voluntary consent, was initially given. And this court said, look at what happened after that. It's possible for a consent situation to morph into an unlawful detention, an unlawful, unconsented detention, depending on the circumstances. And that's exactly what the court held happened in the Washington case, which has a lot of factual parallels to this case. In Brindlin v. California, the passenger in the car, and the issue was whether the passenger was seized as well as the driver. And one of the facts was the passenger in the car, while the trooper was sitting in back, opened his door and then shut it again. And the state of California argued on appeal to the Supreme Court, well, that shows in his mind he believed he had some options. He didn't feel cowed and seized and et cetera. And the Supreme Court, in a footnote, said, that's not relevant. This is an objective test. What's going on in the person's mind is not how you determine the calculus, the test we've created in Mendenhall. It's depending on, under those circumstances, what would a reasonable person think, which also makes it inappropriate to do what the government and what the district court did here, which is to say that it's relevant that there has been some instances, according to this officer, where people have just taken off after a detention. I was where Judge Fletcher was a moment ago when he said, look, voluntariness is inherently a question as to what defendant thought. Are you telling me that's not the case? It's not the case to the extent you're looking at the specific mental process of this individual. It's an objective test. A test of what? What's the question this test is designed to answer? The question is, would a reasonable person, under these circumstances, have felt free to terminate the encounter? You're still stuck on free to go, and I just established that's not determinative. What we're ultimately looking at is voluntariness, and that's where I think that defendant's own state of mind, subjectively, is a critical factor. Well, Your Honor, I may have to agree to disagree because I read the case law as saying that, of course, it all is designed to make an inquiry about what goes on in a person's mind. But I understand it to be an objective test so that, and what I mean by that is, if there's evidence, such as the evidence that the government wants you to focus on, about things this particular person did that show what might have been going on in his or her mind at the time, which doesn't relate to what would a reasonable person under these circumstances be thinking. A reasonable person under the circumstances might not give consent. But that's not the question we ask. We ask, was this consent effective? Yes. But to determine that, you have to ask yourself the objective question. Evidence of what the individual person may have been thinking or feeling, I do not consider under the case law to be what will determine the answer to the question here, as in the Brenlin case. The evidence in the Brenlin case was that that person opened his car door. You can conclude from that, perhaps, that he felt maybe he was free to go and decided he just didn't want to. And the Supreme Court said, no, this is an objective test. Well, where we appear to agree to disagree is your focus on free to go. And my belief, that's not determinative by itself. Well, if I'm focusing on free to go inappropriately, I apologize for that. The question is whether when he said, go ahead, throwing up his hands and letting him search or saying he could search the car, the question is, did he do that as an acquiescence to the show of authority and all the circumstances of coercion that had been applied to him? Or did he do that perfectly freely and voluntarily as if a reasonable person would have done that without any of those signals of law enforcement authority being brought to bear on him? I believe that is the relevant question. The question of the officer having said, you're free to go, is, you know, how much weight does that put into the government's attempt to say this was truly a voluntary consent to the search? I'll reserve the rest of my time for rebuttal. Thank you. Thank you. Judge Hill from the government. Good afternoon. Mike Morrissey for the government. Your Honors, I'd like to address the question that was, has there ever been a case similar to this where the officer said, you're free to go, and then it was found that the consent was invalid? And let me stress, and I urge the Court to read so carefully, the State v. Garcia case, which is cited as being on point. In State v. Garcia, you had a Fourth Amendment violation. It was a bad stop, and that was utterly clear. That's the Tennessee case? Yes, I believe that is the Tennessee case. And so it was the illegitimate stop, the Fourth Amendment violation, that spoiled the consent. That was the problem in that case. There is no similar case where an officer has a legitimate traffic stop. What's your response to the Pennsylvania case? I've got a couple of responses, and it's similar. The Garcia case, the Pennsylvania case, the other cases, all preceded the Supreme Court's decision in Mueller v. Mena because there was confusion. The defense to this day, in both the opening and reply brief, keeps citing Chavez-Valenzuela, seemingly for the idea that after a legitimate traffic stop is over, the officer cannot go back and seek consent. And that's just not right. That's what the Supreme Court has said. And this Court recognized in Mendez that coming back and seeking to talk further is not a separate, discreet Fourth Amendment event. It's entirely appropriate police behavior. So that's my answer. It's not factually similar, and it preceded the Supreme Court's decision. This Court has recognized the force of the Supreme Court's decision in Mendez. The only factor, because we're here to see whether or not the district court committed clear error in any of its factual findings, finding that there was valid consent. Well, I don't know. Is that a clear error? I mean, the facts don't seem to be very disputed. It sounds like a question of law to me. Oh, no, Judge. I think that this Court, in order to disturb the finding of consent, would have to find somewhere. I think I get the Court's question now. Nobody's disputing what happened. Okay. But I think that's important because, for example, both officers testified to their interaction with Mr. Hughes. Sheriff Barrett said in particular that what happened was he re-approaches the car, says, May I ask you some questions? He doesn't pull anybody out of the car. Mr. Hughes says okay. At that point, he says, What's in the cooler? Mr. Hughes shows him the books on bombs. Mr. Hughes is still in the car. They have it. By the time he says, Well, I'd like to search the car, Mr. Hughes gets out of the car, shuts the door behind him, showing he's in control. None of that is contested by the defendant, as the Court is recognizing. And so this Court can find that under those circumstances, which are heavily corroborated by the video. Judge, you mentioned before. Well, I saw the video, but I happened to notice that the video was taken from the second officer, and he shows up. So you can't see very well. You can see the trunk of the car, and every now and again you can see a body walking back and forth. And he turns on the audio after all the critical events have taken place. That is to say, by the time I start hearing things, they're already searching. True. So I find it almost useless. Here's why I don't think that's fair. I understand it's dark. I can see that. I mean, I see the flashing lights. Well, and the only argument, the only way the defense says that the district court went wrong here is by saying that it failed to take into account the flashing lights. First, actually, I think that's incorrect, and it actually is in the Court's order. Let me also note, it's good policy. We want the police to videotape this. I'll agree with that. I wish they'd have the audio of the part that we care about. I do, too. It's a disappointing video because you're happy there's a video. This is going to be very clear. And then you see the video, and the positioning of the car isn't good. Particularly the audio. I mean, I understand it's uncontested. On the other hand, sometimes things that are uncontested, when you actually see it or hear it, you get a different slam, and it's not theirs. Obviously, this is a Kansas police. It's not you. You take what you get. But their behavior, and this is why I raised the video, their behavior on the rest of the video does help the Court draw some inferences as to what must have happened before. Okay? Because clearly they are walking around. Mr. Hughes is not in custody until they find the gun and they feel they've been lied to. I'm sorry. He's not even handcuffed. He was never in custody. He's not handcuffed until they find the pistol. Correct. He's certainly detained so that they can conduct their business for officer safety. But, again, the defense focuses on the lights. We want the video. The way the Kansas system worked is the video only comes on if the officer engages his flashing lights, and there's testimony as to that in the record. Therefore, if you're going to have the video, which we want, you are going to have the flashing lights. Furthermore, Yeah, there's a very small point. The video is being taken in the car behind, which means that the car in front did not need to have the flashing lights. That is, I grant the court's point on that. I would note that Sheriff Barrett's car didn't have a video system. I would also note. In other words, your point about the flashing lights were necessary and his car is not right, or at least you won't make the point as to his car. It's a very small point. It doesn't apply to Sheriff Barrett's car. I agree with that. So the car that's closest to him need not have the lights on for any purpose except maybe safety for other cars coming along the road or something else. Right, which, Judge, I wouldn't discount that because the testimony from Sheriff Barrett was it was very dark. That's in the record. And on this blacktop in remote Kansas, there are no street lights. Right. And so as a policy basis, I don't think the lights. But nobody's questioning, I think, whether the officers were entitled to have their lights on or whether it was a good idea. The question is, what did the totality of circumstances convey to Mr. Hughes? You know, whether they had them on because they needed them for the video, whether they had them on because it was dark and they needed it for safety. The question is not why they had it, but what was the impression. And I have to say that during however long that video was, it ran for maybe 25 minutes or so. I heard two cars go by. Now the sound comes on later, maybe, so I'll extrapolate three cars. It's pretty remote. You know, got two cars there with flashing lights, cops in their uniforms, not very long, you know, two steps, three steps, four steps, whatever it turns out to be away. Can I ask you some questions? Not very many people are going to say under those circumstances, I'm out of here. See you later, bud. Well, but as the court's previous question noted, it's very likely to infer why Mr. Hughes was not intimidated was because he had a belief there was nothing illegal in the car. And the interactions on the video, especially after the audio pickup, show that this was not a coercive situation. At the end, the officers thanked Mr. Hughes. He thanks them. He says thank you on the videotape. Oh, I've had people thank me all the time, and what they really mean is something quite different. You know, I think I've had that experience, too. Thank you for saying that. I would submit, however, that that's a different context than what we see on this video. Yeah, maybe. Are you ever going to talk about the search in Phoenix? Sure, Judge. In terms of do you want to address whether or not he ever made an unequivocal attempt to revoke it? Yes. Okay. It is the government's position that certainly in the van as he's being transported, that is an equivocal invocation. I wish I had revoked my consent. Again, these officers do the right thing because they try to clarify. And the Deputy Patrykos says to Lieutenant Pesky, hey, you need to talk to him, and Mr. Hughes says, I think I want to revoke my consent. It's right there. And Pesky says, okay, but we don't need your consent because we have a search warrant. Which I think at that point probably is not true. It's absolutely true because Pesky's talking about the Wisconsin property. And so the attempt to clarify this went wrong, which is why it never became unequivocal, because the officers do the right thing. They try to clarify it. I have to warn you, I think I'm again on this point, that is to say if there's a problem with communication, it's because the officers are not coordinated among themselves. And in various times, you know, the law goes both ways. Sometimes you guys are advantaged and sometimes you guys are disadvantaged by the assumption that the officers, what's known to some officers in the group is imputed to the other officers. Sometimes it works to your advantage, sometimes it doesn't. The fact that some officers here didn't understand because they didn't know what else was going on, well, tough. No, Judge, good faith matters, and let me tell you why. Because you've just restated one argument the defense makes, which is, wait a minute, why doesn't collective knowledge go both ways? If the officers can rely on collective knowledge to find that there's probable cause, why doesn't it go the other way? And the answer is probable cause is an objective standard that law enforcement either had or didn't have. When you talk about suppressing a search, okay, you're talking about is there a Fourth Amendment need to deter the officer's conduct. And that's subjective. That's not objective. Did they do anything wrong? And that's my point about how hard they tried to do this right at the station. They're right there with Mr. Hughes, and he says, we don't need your consent, we have a search warrant. And Mr. Hughes, who knows, he didn't talk to these officers earlier in the night. Mr. Hughes knows or should know or could say, what are you talking about? I'm talking about the property, my house in Phoenix. And Petraecus said he saw two to three properties and buildings on the Wisconsin site, which is why he believed it could have referred to other buildings. There is, and the judge found this, an excellent record of good faith on this record. There's a great record of good faith. The timing of that phone call back to Phoenix seems to be seriously in dispute in a way that makes me very suspicious. Your Honor, may I make some references to the record on that? Mm-hmm. Agent Salerno testified that by the time he called Moreland, that Agent Moreland had already withdrawn from the Phoenix apartment. He testified. What time did Moreland say he got that phone call? He says he got it late in the afternoon. He says he got it at 5 o'clock or 3 o'clock? 3 o'clock Phoenix time. Which would have meant that the call came out of Wisconsin at 5 o'clock? Approximately. Now, let me ask. But that doesn't fit with what the people in Wisconsin said. Judge, yes, it does. If you really look at the record, what Pesky says is they have a meeting between 11 o'clock and 12 o'clock the next day, and that's when Salerno comes back in. So it's only after the 11 or 12 o'clock meeting is concluded, where are we now, about 1 o'clock, that Salerno can even make that phone call. Well, do we know how long that meeting lasted? I'm unsure where you're getting the 1 o'clock termination point. I'm guessing, which I've got to be careful with, but here's my point. It is in the record as an established fact that Pesky says the meeting was, this is at page 48 of the suppression hearing, was at 11 or 12. Then he names who all was there, the deputy county attorney, Pesky, Petrakis, Salerno, okay? It shows up. That meeting has to take between a half hour to an hour when you get lawyers and agents in the room trying to figure this out. But even so, let's, Judge, let's take. But it didn't call until 5 o'clock. I don't think. It called right after. Let me just walk through the testimony, because Pesky says it's 11 or 12. Let's guess it takes a half hour to resolve that, okay? If they called right away, which Salerno could not say that he had done, Salerno says, I don't know when I called. That's what he says. At one point he says he called right away. Right. He changes his testimony. Judge, I don't think so. I think he honestly didn't have a very good recollection, and as a good witness should, if you get pinned on a point and it turns out you didn't really know and think through what you were talking about, he said, I don't know. And then we factor in Agent Moreland, who's quite definitive that it took a couple hours to do the search warrant, and he was out. If the phone call is made at 12.30, which is as early as you can say, it's still 10.30 Phoenix time, and they were out of the apartment. I understand that point. And so I think the great weight of the testimony from Moreland, Pesky, and Petraecus. Here's where I go with this one. I would be inclined nonetheless to think that the consent had been withdrawn, and irrespective of when that phone call was made, because the previous evening they should have been on notice. But I'm not sure in the end that that will hurt you very much because you can still have the fruits of that search if you can show that a warrant would in any event have been obtained and the warrant would have in any event allowed the same evidence to show up. Your Honor. Let me tell you where I'm really worried about your case, and that is to say I think the judge fouled it up in response to count three. When he says there's no weapon in this case or whatever he says. No, okay. That one bothers me a lot because the jury sends out a note saying what's the definition of a weapon of law when the issue is whether or not the right is a weapon. And the answer he gives seems to me totally misleading. No, Judge, and I appreciate the court's directness with what is or is not bothering you. That's the one that's bothering me. Okay. First, as to whether a search warrant would have been inevitably sought. The defense cites Agent Moreland saying, well, it would have been thin. But that's on the 11th when he says it would have been thin, which is why I wanted to get an interview. The next day, Moreland testified that by the 12th, because he's been told what Mr. Hughes has been saying in Wisconsin, he says I was going to get consent or go for a search warrant, which is why the government's record that it would have been inevitably a search warrant is a valid point. Now, let me address the jury instruction issue. Do you have enough for a search warrant? Yes, if you include what Mr. Hughes told the agents in the van in Wisconsin on the night of the 11th. And that's the difference, and that's why Moreland on the 11th quite honestly says it would have been thin, and he had talked to the U.S. Attorney's Office. By the end of the 11th, once he's been told that information on the 12th, he would have applied for a search warrant. That's what he said, which is why the government has a good argument, and we did make this argument below and cited cases to the court as to inevitable discovery. Let me address the supplemental jury instruction. There's no question or no dispute that the jury was substantively and correctly given the law on how to find whether or not there was an attempted production of ricin. The jury does send this question saying, what's the definition of, quote, weapon under law? And the court's response is literal, but what the court says is, weapon under law, that phrase isn't in this case. And so it refers to the law. Now, let's get exactly right. What exactly did the district judge say? Because that's not exactly what he said. What did he say? It said this definition. Where are we in the excerpts? Well, Judge, the ‑‑ I have the note right here. It was submitted as Exhibit 109 under seal, I believe, by the defense. And so I don't think you're going to find it in the excerpts of record, because the defense brief ‑‑ Are you talking about the note or the ‑‑ Well, the note and the judge's response. What I recall was there was dialogue when they talked about this. The defense brief claims to have submitted it under seal, which is why it's not in the excerpt of record, and I make that note in my brief. Okay. So what's the best evidence we have as to precisely what it is that the judge answered? We know exactly, because we have the note. As I said, it's Exhibit 109. The judge answered, this definition is not an issue in this case. Please refer to the court's instructions. And so the court's response is quite literal. And, by the way, the defense does misquote the court's response. He didn't say, duh. Did both parties also agree to that? No. The defense said, Judge, just tell them to refer to the jury instructions. The defense didn't like the first sentence. Well, the first sentence is wrong. Well, that's why I'm here. The ‑‑ I don't think it is, Your Honor. Read it again. Okay. This definition is not an issue in this case. And the judge is correct. The definition of a weapon is not an issue in this case? No, because we know what the weapon is. That's already been defined for the jury as that which has been, if a toxin is used with the intent to injure or harm another person or persons. It's right in the jury instruction. And let me point out, the defense says, here's how they could have been confused. The jury could have thought that the gloves or the lie or the something else was the weapon. And, no, they couldn't have. Because the instruction says it's got to be the toxin which is the weapon. And what's a weapon? It's something you use with intent to injure or harm. There's no way this jury could have thought, well, we can convict if he was attempting to use ricin for medicinal purposes or peaceful purposes. It could not have happened under these instructions. No, you know, it seems to me that the ordinary use of weapon, as we talk about, a weapon is a knife, a weapon is a gun, and so on. It's within the vocabulary to have a toxin as a weapon. But that's a slightly unusual usage. And I think they're asking, okay, are you talking about toxin? Is toxin a weapon? And he says, no, that's not an issue. Judge, okay, well, the government's position is the court was entitled to take the jury's question quite literally because they wrote weapon under law in caps, and the judge took that as a unitary statement. Weapon under law, what are they talking about? And referred them back to the instructions. He gave them the help they needed. I'm curious as to why you say it doesn't make any difference, the fact that both the prosecution and the defendant wanted him to refer back to the instructions. No, that's not what I said. And if I misspoke, then I apologize. Judge Fletcher's question was, did both parties agree to this response? Oh, it was my question. Oh, I'm sorry. Well, I was the one who knew it. Those are good questions. He'll take credit. And the answer is I cannot say both parties agreed to the exact wording of this response because the difference To the response, to the idea that referring back to the initial instruction. Both parties agreed to that, absolutely. Why isn't that the key? It absolutely is key, which is why, as the government argues in its brief, even if you want to say that the verbiage wasn't perfect in sentence one, that harmless error applies to a supplemental jury instruction, and the instruction go back to the jury instructions, which is where all the answers were, and there's no way they could have been confused about what was a weapon. Number one, it was appropriate and within the court's sound discretion. Number two, if the verbiage in sentence one was error, then it's harmless error, and this court should affirm. I see that somehow you step all my time. It happens every time. And unless the court has further questions. I cannot respond. Dennis Hughes had a lot of interesting stuff in his residences, as well as his car. The issue of whether the stuff he had was intended to be used by him as a weapon was the key, the most crucial issue in this case, without convincing the jury. In his car or in his feet? Everything. Well, and we're talking about his residence now, because in count three is what Judge Fletcher asked about. Count three involves the supposed attempt at production of ricin, and the instructions on the appellee's excerpts of record, attempt to produce a toxin with the intent to use as a weapon means attempt to produce a toxin with the intent to use it to injure or harm another person or persons. Now, the testimony was clear, and the government's witnesses agreed with this, that castor plants are perfectly normal legal plants people can have for decorative purposes. There's nothing illegal about having castor plants, or even unusual about having castor plants. He had some stuff. He had a mortar and pestle. He had a food dehydrator. He had Internet searches and so forth that related to the idea of making a toxin out of pieces of this plant. But only by convincing the jury that he intended to actually make that and use it as a weapon, and not just as an interest and as a hobby, of which he clearly had many, could the government have any chance of winning this case. When the judge said to the jury, and the exact quotation actually is, the note isn't in the public record, but the quotation is, because on the appellee's excerpts of record, page 164, the judge says exactly what his response to the jury was on the top of page 164. This definition is not an issue in this case, period. Please refer to the court's instructions, period. Then Mr. Hughes's lawyer says, judge, we request that the answer be limited to, please refer to your instructions. Clearly an objection to that part of the response to the jury, where the judge effectively took 99.9% of the government's case and told the jurors, don't worry about it. Not an issue. Not an issue means not disputed. Was there something wrong with the instructions on that subject? I mean, you don't object to the instruction with regard to that count. I don't believe we objected to the instruction. The problem comes in when the judge tells the jurors to assume that's a given, to take it as established. What was the key contested issue in the case? Okay. Thank you. Thank both of you. Very nice arguments in this last case. United States v. Hughes is now submitted, and we are on adjournment. I think the phrase is sine die. Thank you.
judges: Hug, Fletcher, Clifton